Jones, I see you're significantly outnumbered over there. Know the feeling, yeah, when you're over there with the government. All right, good morning. I know we probably have veterans, so you know the rules in the court. The main one is just to speak up loudly enough. I have a tendency to drop back in my seat and nobody can hear me but me, so I'm speaking from experience to try to stay in the mic so we can hear the questions. This first case has got a lot going on, which is putting in Miley. The government's got its cross appeal and so forth. So, Madam Clerk, give each side now an additional five minutes on their side so you've got ample time to cover it. That doesn't mean you've got to use all of it, but you get an extra five off the get-go so that when the light's red. So hopefully that gives you a bit more time to cover everything in light of the questions and so forth that we'll ask. Okay, that said, we'll call up the first case, USA v. Chapman, Perry, et al. Mr. Aberle, you're the first up. Good morning, Your Honors. Chris Aberle, court appointed for Jermaine Chapman, who with respect to firearm conviction in Count 10 challenges the district court's denial of his motion for new trial, at least insofar as the court ruled without giving him an evidentiary hearing. The court held that the newly discovered evidence, which was the proposed testimony of John West, would not, even if it was believed, likely result in an acquittal. The court said that the jury would likely find that he'd be a member of the conspiracy and therefore my client would be, by conspiratorial liability, be criminally responsible for those guns, and our counterposition is simple. First, the jury could not, as a matter of law, based on Mr. West's mere presence in this home or even from the knowledge of Mr. Perry's criminal activities that can be inferred from his familiarity with the hiding places, that alone would not allow a jury to find him to be a member of the conspiracy. But even if the jury likely would find that and legally could find that, the next step that the jury would have to find is that those guns were possessed in furtherance of the drug trafficking offense, and if, as the court assumed, Mr. West is telling the truth, the jury would not be able to both find that those guns were held for that purpose, given that Mr. West said he owned them, he put them there, no one knew about it, and he put them there for the purpose of selling them. Now, the government relies on the reasoning of the district court, but it adds that Mr. Chapman failed three other of the very factors which were just assumed in Mr. Chapman's favor by the district court. The first one is that Mr. Chapman never alleged that the evidence was new to him, but as the government itself acknowledges, he adopted this motion. He did so claiming he was in a procedurally similar situation, and he claimed that he did so as though he wrote it himself, and the motion itself says that this evidence is newly discovered. The next very factor that the government says my client must fail is whether his ‑‑ he cannot establish that his failure to discover this evidence was not the result of his lack of diligence, and in this regard, the government points to the discovery that was provided to him which shows that West was arrested and that those guns were found, but that discovery material, Your Honor, shows that Mr. West denied having anything to do with Mr. Perry's criminal activity. It shows that he was merely sitting on a couch. Mr. Perry was not there. Mr. Chapman was not there.  And the guns were found in another room underneath the sink in a hidden compartment. So whether or not diligence is an issue in this case can't really be determined without an evidentiary hearing, and the final factor that the government claims we didn't meet is that the evidence was material, and for this argument, the government claims that the evidence is, as a matter of law, insufficient to support a Rule 33 motion because it is simply a declaration of an attorney relating the statement of a witness. In this case, it would be John West's attorney relating West's statement. The government cites United States v. Wall, which held that such evidence is not sufficient or is not admissible at a hearing, but there was a hearing in that case. Wall does not stand for the proposition that for purposes of pleading, filing a motion, such evidence is not sufficient to trigger the right to a hearing. Preparing for a four-minute speech, I would conclude at this point saying that what we're asking for is that the motion, the ruling of the motion be reversed and that Mr. Chapman be allowed to have an evidentiary hearing. All right. Thank you, sir. Mr. Scott. Good morning, Your Honor. Joseph Scott, court-appointed counsel for Charles Boyer. I represented him at trial, and I represented him on appeal. We love having the lawyers who are there at the scene. It's been my preference as well, although I haven't been here in front of a panel since United States v. Bringer many years ago. You're relatively harmless. I appreciate that, Your Honor. That's true, relatively. Yes, ma'am. I'm here because Charles, I felt, was unfairly treated by the court and the jury in very specific ways. I would say at the outset that I have a lot of respect for Judge Brady and Judge Dick. I've tried cases in front of both of them. And if I had tried the case in front of either one of them in its entirety, I don't think I'd be here. Your Honor, we had a substitution midway through the trial after Judge Brady heard five days of testimony. He fell ill on a Saturday, I believe. That was when all the lawyers had to start talking and doing phone conferences over the weekend. And Judge Dick stepped in and did her usual able job of trying the case, but there was a fracture. The purpose of the trial judge, in no small part, is to observe the witnesses, not so as to interfere with the jury, but to be a backstop for the jury. And the reason that we don't change things on appeal is because you're looking at a cold record. You weren't there to watch these witnesses. And Judge Brady was there for the first half. Judge Dick was there for the second half. It was a jury trial, right? It was a jury trial, Your Honor. The jury was there for the whole time. The jury was there for the whole thing. Speed up. I mean, tell me what the palpable disconnect was. Yes, sir. When Judge Brady denied the motion to sever, which was October down, I want to say document 211 in the record, instead of severance, this court finds that it can sufficiently mitigate the possibility of prejudice through jury instructions and by continuing to monitor this case as it progresses to trial. I believe Judge Brady meant it when he said it, and I think he just didn't have the opportunity, due to poor luck, to continually monitor the progression of the trial. So what are you saying? Are you saying had he been there for the rest of the time, he might have changed his mind based on, I mean, what? He might have been in a better position to craft or permit jury instructions, which were denied by Judge Dick, or to judge differently as to the motion for acquittal or new trial, and the new trial in particular. You know you're sled uphill. Oh, I do, sir. Lubricant on the hill. So to be able to get to where I think you're going, you're going to have to anchor it to something more than, you know, that's able counsel's advocacy. We get it, but from what I saw from the briefing, I mean, it looked like a relatively smooth transition, et cetera. I thought you were going to say, well, she didn't read the record. She didn't know what was going on. But if it's on the motion to sever, just help me get to where you are on how the motion to sever, you get relief on this with the transition of the judge. I didn't read. I missed it in the brief. Yes, sir. The judge who has the opportunity to observe all of the witnesses and make their own independent conclusions about those witnesses and who ruled on the various pretrial motions. What did he miss that he would have seen that would have made the difference? Your Honor, I'd be lying to you if I said it wasn't a blur trying this case two and a half years ago. I believe that when we pulled Mark Allen out and showed that he had been talking to other witnesses while he was incarcerated, that Darnell Dalton had done the same thing, although the witness that Darnell Dalton spoke to, Sean Dean, was pulled out of the lineup and the government dismissed the case. Yes, but what makes this case different? You know that a consolidated trial of defendants like in this, this is the rule, not the exception. I mean, it's rare that a motion to sever is granted, and if it is, that's not brought up.  You've got the difference of a substitute judge, so you've got to hurry to get to tell me why, given the Heartland is a consolidated trial, where there's always going to be these co-defendants, you know, here, there, wasn't me, wasn't him, what in this, because we've got the cold record. So if we're looking at the record, what are we going to see to anchor to what you're telling us, that was a reversible error as relates to the motion presented? Your Honor, I think that the jury's verdicts demonstrate the spillover effect, that if we could have tried the nominally, the guys with three and one charges, we would have had a clean sweep, and I'm stuck because I can't interview jurors after the fact to find out where the critical spillover was, whether being yoked to the leaders of an organization made the difference. And I also just got to say in my ten seconds that I take the position that Mr. Boyer was paying for his crack in services and that he was a purchaser, and paying for crack in services, which are useful to the conspiracy, is not necessarily joining in the goals and means of a conspiracy. All right. I appreciate that. Did you make that argument to the jury or were you precluded? I went back through and read my clothes and— Come on, Mr. Scott, you were there. I mean, that's the kind of stuff appellate specialists got to be saying. Well, I read it right there. You were on the ground. You're supposed to remember this stuff. And I did, Judge. So did you make the argument to the jury or not? I believe that I did. Why would you have doubt about that? Sir? I'm saying why would you have doubt about whether you did or not? I argued a whole lot. All right. I'm going to assume you argued it to the jury. I can't imagine why you wouldn't. And I— But I guarantee you Ms. Jones is going to get up here and tell me that you did. So at any event, I just wanted to know. Yes, sir. All right. Your five's over. Thank you, Your Honor. But we got you. Your major argument is that there's an error with respect to the motion to sever. Substituting the judges exacerbated the problem, dot, dot, dot, right? And everything flows from there. Got you. Thank you, sir. Thank you, sir. All right. Ms. Rivers, who brings five pounds worth of book up with her. My workout today. Is that your Linus blanket? Yes. Sorry. Good morning, Your Honors. My name is Lauren Rivera. Behind me is Mr. Mike Walsh, who was appointed on appeal to represent the appellant and cross-appellee in this matter, Mr. Jeffrey Perry. We were not trial counsel in this matter. I assisted Mike Walsh in drafting these briefs. And with the court's permission, I would like to present the argument. I'd also like to reserve five minutes to address the government's cross-appeal. Okay. You got it. While it's understood that due deference must be given to the jury's weighing of credibility and facts, the real issue before this court when it comes to Jeffrey Perry is whether or not the government presented sufficient evidence to satisfy the burden of proof of proving that Mr. Perry knowingly and voluntarily agreed to participate in a narcotics distribution conspiracy in violation of 21 U.S.C. 846. Or if instead, the evidence submitted by the government simply proved what was already conceded by trial counsel. And that is that Mr. Perry, while morally reprehensible, did not participate in a conspiracy, but rather sold and distributed drugs individually for his own mutual gain and benefit. And while both are morally reprehensible, the distinction between the two is important. Whereas the latter really just involves a buyer-seller agreement, a simple transaction between two parties in which one agrees to sell drugs and the other agrees to buy. There's an indifference there towards the ultimate, what the buyer does with the drugs. Whereas the former represents an informed and interested cooperation, an intent to participate. It is this agreement and this intent that is the backbone of a conspiracy charge. And it's this intent and agreement that is the fatal flaw of the government's argument. Because no matter how overwhelmingly the government showed that Mr. Perry participated in drug sales, it did not show any further agreement to join in the further crime of conspiracy. Now the burden of proof here, while direct evidence doesn't have to be used, if circumstantial evidence is to be used, a proof of agreement for a conspiracy, as this court found in United States v. White, is not to be lightly inferred. Circumstantial evidence in this case was used by the government to satisfy their burden of proving beyond a reasonable doubt that a conspiracy was entered by Mr. Perry. The government had the burden of proving three things. The first is that an agreement existed. The second is that Mr. Perry knew of the agreement. The third is that with that knowledge, Mr. Perry voluntarily and knowingly agreed to participate in the conspiracy. Now there's a number of factors that different courts who have considered this issue have used in order to determine whether the circumstantial evidence is sufficient. I'm not going to really go through all the factors, but a few of them that we believe are important in this case are the level of mutual trust, the extent the transactions were standardized, and the uniformity in payment. So essentially this was a two-week trial, give or take some time in between, in which over 30 individual witnesses testified and 50 different people appeared on behalf of the government. Standing alone, 30 witnesses alone suggests that no conspiracy really could have been committed as a whole because if a conspiracy was the actual crime, there should have been no need for 30 different witnesses to come in to create this web. In addition to that, in terms of the level of mutual trust, the trial testimony revealed very clearly that unfortunately this was a sad story of distrust, robberies, just between the defendants, I mean the alleged co-conspirators alone, particularly Mr. Mark Allen, who I believe or I know testified specifically that quote-unquote every chance he got and multiple times a day, he stole drugs from these different homes where they were located. To me, standing alone, this really already shows that there was no agreement because if you were working together cooperatively, you would want to benefit for the whole to sell those drugs. In terms of uniformity of payment... Drug conspiracies don't operate like a law firm, you know what I mean? These are not choir boys. The kinds of things you describe are very common in drug conspiracies. Yes, ma'am. I think that, Your Honor, really what it goes to show is the circumstantial evidence here without a proof of an agreement. You have to show through circumstantial evidence that a conspiracy was entered. And the issue here is without an actual agreement, all you have are the relevant facts as they relate to these parties, whether choir boys or addicts who are all, have their own individual issues. You have to take the circumstantial evidence you are presenting and it's our opinion that based on the circumstantial evidence, these guys weren't working in cooperation. Mr. Perry, while some of them may have wanted to be in this reprehensible but quite lucrative operation he was running, it was never in Mr. Perry's best interest to get anyone else involved in this. There was nothing that any of these people could have really done to benefit him. Multiple ones were addicts and they had their own issues. But frankly, whether his conduct was itself illegal is irrelevant to his state of mind with respect to the crime of conspiracy. And as a spoke, you can't take spokes of a wheel without an overarching rim of an agreement and make a conspiracy. Although Mr. Perry was the hub, they were the spokes. There was no rim of an overarching agreement. So for that reason, we ask that his conviction for conspiracy be reversed and this be remanded for the trial court for recency. Thank you. All right. Ms. Jones for the government. Thank you, Your Honor. May it please the court, my name is Patricia Jones and I'm an assistant United States attorney for the Middle District of Louisiana. Let me begin with our cross appeal. The cross appeal concerns two 924C convictions by Mr. Perry and the sentence that he received on those convictions. It's our contention that the district court erred in not imposing the enhanced penalty for a second or subsequent conviction on either of those two convictions. Mr. Perry was convicted in count six of discharging a firearm during and in relation to a crime of violence, that is a carjacking that was charged in count five, and a drug trafficking offense, which was the conspiracy charged in count one. He was also convicted in count ten of possession of firearms in furtherance of drug trafficking, and that was the drug trafficking charged in count nine for drugs found at the Evergreen Click House and also the drug trafficking offense, conspiracy offense. That was a possession and a first conviction for a possession count is five years. The penalty for a first conviction of a discharge count is ten years. In this case, the judge imposed five years on count ten and ten years on count six to run consecutive to Mr. Perry's life sentence on the other charges, on the conspiracy charge. The United States Supreme Court in United States v. Deal held that multiple guilty verdicts in a single case constitute multiple convictions under 924C, and therefore that the enhanced penalty does apply to the second or subsequent convictions obtained in that single trial. In this case, the judge ignored the ruling of United States v. Deal by not imposing that enhanced penalty. The judge did so because she could not determine which of the convictions came first and which was the second one. The United States concedes that there is no way of determining which of the convictions was first, which the jury voted on first. They were both returned at the same time, and which is second. But because Deal held that necessarily one is first and one is second, the judge should have made some determination. In this case, the order of the convictions does, in fact, make a difference. In some cases, it doesn't. If he had been charged and convicted of two possession counts, it wouldn't matter which one was determined to be first and which one was determined to be second. But here, there is a higher penalty for the first conviction on the discharge count. So if that count is first, Mr. Perry would receive a 35-year consecutive sentence. If the possession count is first, he would receive five years on that, making for a total of 30 years. So it's a five-year difference, depending on which one is first in this case. So we concede that the rule of lenity should apply. That's consistent with what's been done in other circuits. The ninth, the second, and the sixth have all held that when there is no way to determine which conviction came first, apply the rule of lenity and use the least serious conviction as your first count. And that's our position on the cross-appeal. I was just dealt with below, I mean, procedurally. I know you teed it up. You asked a judge. Did you make this suggestion? Oh, yes, Your Honor. I'm not sure. I didn't understand that Your Honor was finished. I'm just trying to visualize, you know, whether it was just sort of said and assumed the judge would kind of get it, or whether, you know, a more extensive, I'm not suggesting that whether you did or didn't necessarily means that if you're right, you know, you don't get it. I'm just trying to understand better process-wise. We got to this point because of the difficulty of determining order, how it was, you know, laid out. We filed three objections to the pre-sentence report, to three different paragraphs in the pre-sentence report. Our objections 8, 11, and 12 related to this issue. We cited the court to the Deal case as well as to the Major case, which is the case from the Ninth Circuit, which applied the rule of lenity. The judge recognized both Deal and Major when she ruled on the issue. She indicated that she was following the Ninth Circuit's decision in Major, but, in fact, she didn't. She indicated she was following Major, but Major says apply, use the least serious as your first offense. She didn't count either of the offenses as the second offense. And so she didn't follow Major, but she was aware of it, she was aware of Deal, and the United States did present the issue in writing and argued it, but briefly, at sentencing. Okay. So we've got it fairly presented. It's not a case of, you know, laying behind a log or it was missed or nobody brought it to attention. So if it's an error, it's just an error, and that's what we get paid to do to correct if it's there. Now, as a practical matter, what impact, you know, assuming you're right and we so hold, what's the impact on the sentencing going back down, I mean, given what he got otherwise? Your Honor, he obviously has a substantial sentence. He has life and he has 15 years in addition to that. At the time we filed the cross appeal, we did not know the substance of the appeal or what its outcome would be. We didn't know if the conspiracy charge, which is the life sentence, would stand up, if Mr. Perry would challenge the sentence, and so we filed this essentially to hedge our bets. I think that still applies, and the issue is one also that will no doubt arise again in our district as well as in other districts in this circuit. And so for that reason, we would ask the court to give guidance to the courts below on that issue. All right. You can proceed on with your other one. Thank you. That was helpful. Yes, sir. And I would note that the defendant has never disputed that the court made sentencing error. The defendant's response to our cross appeal is only that the 924C conviction on the discharge count should not be upheld because it relies on the crime of violence definition in 924C3B, which is similar to the crime of violence definition in Section 16B, the residual clause. But, of course, Mr. Perry waived that argument. He didn't challenge his 924C convictions. He had every opportunity to do so, so that issue is simply not before the court. And given those convictions, Perry doesn't argue that the judge did not make a sentencing error in failing to impose the Hans penalty. As far as Mr. Chapman is concerned and his motion for new trial, I think Mr. Chapman makes more out of the information from Mr. West than really is there. Mr. West said, according to the declaration provided by Perry's co-counsel, three short, brief things. He possessed and owned the firearms. He stored them at the Evergreen House with the intent to sell them, and he did so without Mr. Perry's knowledge. The affidavit says nothing about Mr. Chapman's knowledge. It says nothing about whether Mr. West was a part of the conspiracy. It says nothing about whether the guns were stored there in furtherance of the conspiracy. In fact, the fact that he said he was going to sell them is not inconsistent with being in furtherance, bless you, Your Honor, in furtherance of the conspiracy at all. For instance, Mr. West could have been intending to sell the guns to Mr. Perry or one of his co-conspirators for the guns, and he kept it there with the intent to exchange the guns for drugs. And in fact, there was a substantial amount of testimony at trial that guns and stolen items were bartered for drugs at the click houses. Mr. Chapman argues that the United States cannot rely simply on West's argument to show that he was a co-conspirator, but he's forgetting that he has the burden of proof here. It is Mr. Chapman who is seeking a new trial, and Mr. Chapman has the burden of proving that that information from Mr. West would probably have resulted in an acquittal. And because the affidavit is so vague and so brief and doesn't actually contradict any of the evidence of guilt of either Mr. Perry or Mr. Chapman, then it certainly could not result in an acquittal in this case, or at least he hasn't carried his burden of showing that. With respect to due diligence and the need for a hearing, Mr. Chapman argues that there should have been a hearing, and he addresses due diligence for the first time today. It wasn't addressed in the brief. It wasn't addressed in the district court. There has never been a mention of due diligence before today. And it is his burden to come forward with evidence and show the district court why this information was not obtained prior to trial if, in fact, it wasn't. There was no information given about the circumstances under which this information was found. There was no information about when it was discovered, how it was discovered, anything of that nature. There's no evidence that they reached out to Mr. West at any time. And, in fact, there's not even any allegations as to any of this. Absent allegations and substantive proof of due diligence, one of the very factors, Mr. Perry was not entitled to a hearing on the motion for new trial. In fact, this court has held that there are only limited circumstances in which a hearing is called for on a motion for new trial, and that is when there are allegations of prosecutorial misconduct, not at issue here, jury tampering, not at issue here, or third-party confession, not at issue here. And so there was no need for a hearing. And, in fact, Mr. Chapman and Mr. Perry provided no information as to what a hearing would have shown. There were no facts proffered as to how Mr. West would have testified or even if, in fact, he would have waived his Fifth Amendment privilege and testified. As a matter of fact, Mr. West is mentioned in Mr. Perry's pre-sentence report as a crack addict who hung out at the house and did favors for, ran errands for Mr. Perry in exchange for crack. And so it is unlikely that Mr. West would have waived his privilege against self-incrimination in order to testify at a hearing on a motion for new trial, and no allegations were made to the contrary. With respect to Mr. Boyer, his primary complaint is spillover and the severance motion, that his motion for severance should have been granted. Unfortunately, Mr. Boyer provides no specific information as to what the spillover was. This was a conspiracy case in which Mr. Boyer was charged in the conspiracy and two substantive counts, and all of the substantive counts in this case were part of the conspiracy. And so all of that information would have been admissible against Mr. Boyer in a separate trial. I mean, perhaps there are little blips of information that might not have been admissible in a separate trial, but Mr. Boyer has not pointed those out to us, and I can't think of any off the top of my head. So we really don't have any evidence that could cause a spillover effect because all of the information could have been introduced against Mr. Boyer at a separate trial. Additionally, Mr. Boyer made a statement about because Judge Dick substituted for Judge Brady, he didn't get the jury charge that he wanted. I'm not sure what he's referring to. I'm not aware of a charge that he asked for that he didn't get. But the district judge did, in fact, instruct the jury to treat each defendant separately and to treat each count separately, and the jury did exactly that. The jury convicted Mr. Perry of two, excuse me, acquitted Mr. Perry of two counts. It acquitted Mr. Chapman of three counts. It acquitted Mr. Boyer himself of two counts, and it acquitted Mr. Williams, who was charged only in the conspiracy count, entirely. And so Mr. Chapman's argument in his brief that it was the conspiracy count that was so confusing and the jury was so overwhelmed that they wouldn't be able to judge the conspiracy count doesn't hold water since Mr. Williams was acquitted of that count. Finally, Your Honors, as to Mr. Perry. Mr. Perry argues that this case is nothing but a buyer-seller situation, and that's not at all what this is. This Court has recognized that if a seller sells drugs to a buyer, and that is the extent of the evidence of a conspiracy, that that is not a conspiracy. Understandably, that is just a transaction. That's not what this case is. In this case, there were at least 12 co-conspirators who assisted Mr. Perry, who didn't just buy drugs from Mr. Perry, who assisted Mr. Perry in his operation. They handled sales for him to other parties. They retrieved drugs from storage locations. They stored drugs in hidden compartments. They weighed and bagged drugs for him. They took trips with him to Texas to get drugs. They committed robberies for him. Crack addict Mark Allen tested the dope for Mr. Perry after he cooked the cocaine into crack. They guarded the drugs for him. It went on and on and on. This is not a case of just a buyer and a seller. It's a case of a large organization operated by Mr. Perry with a very strong arm. When drugs came up missing one time, he beat up both Mr. Chapman and Mr. Boyer for that mistake. That is evidence of the conspiratorial relationship between them, in addition, of course, to everything else in the case. And if the court has no questions, I'll rest on my brief. Thank you, Your Honor. All right. Back to you, Ms. Rivera. May it please the court. We're back here just really to address a few simple things. Not simple things, but a few things addressed by the government's argument regarding our cross-appeal. And the government is correct that we did not raise the 924C issue on appeal, and that was for a number of reasons. First, the Fifth Circuit at that point had clear precedent in Gonzalez v. Longoria that it would not rule the 924C, which is exactly identical to 916B, was it had already ruled it was constitutional and not unconstitutionally vague under the Due Process Clause. Thus, at the time, we did not have a basis, a good faith basis to base this argument off of. Also, in addition to that, it wasn't necessarily in Mr. Perry's best interest to do so. But we raised the constitutionality, the unconstitutionality of 924C here really to just, as a defense to the government's argument, and to bring it to the court's attention that this may be a bigger issue than what's before this court right now, based on the Lynch v. DeMaio decision that's in front of the United States Supreme Court right now. You're not looking for an advisory opinion, are you? No, Your Honor. It may be that the court reserves a decision on this. It's just an issue that we think is much broader and much more significant than just this issue. And based on Lynch v. DeMaio and the fact that 916B raises this identical language, the implications of that decision on this decision may impact it, regardless of how this court rules today. So 924C, as the government discusses, really involves—it raises the risk of force or the residual clause. According to the government's argument, count six, which is the discharge count, involves a crime of violence, which here was carjacking. Now, the risk of force clause is the first clause in 924C. The second clause is the residual clause, which is the clause before the Supreme Court right now. We disagree that carjacking, count six, would fall under the risk of force clause, because by its definition, 924C— I mean, by its definition, the carjacking statute specifically requires that the government prove the taking of a motor vehicle by force or intimidation. And this court has defined a taking by intimidation as a taking that occurs when an ordinary person in the victim's position reasonably could infer a threat of bodily harm from the defendant's acts. And unlike the government, we believe the case law distinguishes between threatened harm and a threatened use of force. In Singleton, this court held that it was enough that there was a substantial risk of physical force for a defendant to be convicted of carjacking, which shows that the crime of carjacking falls under the residual clause, the second clause, the clause that's before the United States Supreme Court right now. So should SCOTUS find 916B's residual clause, the second clause, is unconstitutionally vague based on its language, the identical language in 924C would also potentially be unconstitutionally vague. And since it's our position that the carjacking statute falls under the second clause rather than the government's position that it falls under the first, we believe that Judge Dick's sentence, depending on the outcome of the Supreme Court, may still fall, still be considered constitutional should that decision reverse 924C on the residual clause. Thank you for your time. Appreciate it. Done well.